**GOUDY & STEVENS, INC.,**
**Plaintiff, Appellee,**

v.

**CABLE MARINE, INC., et al.,**
**Defendants, Appellants.**

**No. 89–2037.**

United States Court of Appeals,
First Circuit.

Heard Oct. 4, 1990.

Decided Jan. 23, 1991.

See also 665 F.Supp 67.

Daniel W. Boutin, with whom Martin R. Johnson and Johnson, Jewell & Boutin, were on brief, for defendants, appellants.

Thomas S. Howard, with whom Kirsh, Gartenberg & Howard and Holly B. Tashjian, were on brief, for plaintiff, appellee.

Before CAMPBELL and TORRUELLA, Circuit Judges, and ATKINS,* Senior District Judge.

TORRUELLA, Circuit Judge.

Appellee Goudy & Stevens, Inc. instituted this action in admiralty to enforce a lien for materials and labor furnished for the construction of the vessel WARRIOR. Appellants Cable Marine, Inc., 16th Street Properties, and the WARRIOR counterclaimed to recover damages suffered as a result of the sinking of the vessel while tied up to appellee's dock. A judgment entered into by the parties prior to trial disposed of the original claims. A six-day bench trial on the remaining counterclaims led to the district court's conclusion that appellee was in fact a bailee of the vessel within the legal meaning of the term, but that the shipyard was not liable for the damages suffered as a result of the vessel's sinking. It is from this latter determination that appellants now seek recourse before us. We affirm.

### I

On June 16, 1985, co-appellant 16th Street Properties purchased the sports fishing yacht WARRIOR from Warrior Yachts, Inc. The WARRIOR was of custom design and had been built for Warrior Yachts by appellee Goudy & Stevens. Goudy & Stevens is a corporation which operates a boatyard in East Boothbay, Maine.[1] Construction of the WARRIOR had begun in 1981 and ceased in 1983 when a dispute arose between Goudy & Stevens and the yacht's prior owner over construction costs and delays related thereto.

Upon purchasing the WARRIOR, 16th Street Properties issued a work order to Cable Marine, Inc., a corporation which owns several shipyards in Fort Lauderdale, Florida. The terms of the agreement called for Cable Marine to arrange for the outfitting of the WARRIOR at Goudy & Stevens on behalf of 16th Street Properties. It was agreed that Goudy & Stevens personnel, together with Cable Marine's mechanic, Mr. Robert Douglas, were to prepare the vessel to navigate under its own power to Fort Lauderdale where permanent construction would be completed.

During the time the repairs were being made, Mr. Douglas worked at the shipyard virtually every day. Once permission was obtained from Goudy & Stevens for him to remain on board and work on the yacht, he had unrestricted access to the vessel at all times. Although employed as a mechanic by Cable Marine, his work on board the WARRIOR was not strictly in that capacity but extended to all aspects of the ship. Work consumed an average of ten hours a day, seven days a week. Goudy & Stevens personnel, on the other hand, were not encouraged to work overtime and were not allowed to work on weekends. Although Douglas worked independently from Goudy & Stevens personnel, they cooperated with one another in many respects.

We digress momentarily to note that the district court found that in the years leading up to the events of this case there had never been a twenty-four hour watchman on duty at the Goudy & Stevens yard.[2] Ordinarily, however, a guard had been on duty from 6:00 a.m. to 11:00 p.m. Even when a watchman was on duty his responsibilities were circumscribed to starting up the machinery during the morning and keeping a watch for fires that might flare up due to the activities of the day. Guards would spend most of their time on the construction side of the yard, walking over to the yacht side about once an hour to

---

* Of the Southern District of Florida, sitting by designation.

1. The shipyard has two sides, one for the construction of new ships and the other for the operation of a marina and storage facility; the two sides are separated by a pier operated by a third party.

2. The shipyard's rate schedule provided, however, that:

Although the yard maintains a shipbuilder's liability policy covering accident or negligence on the part of the yard, the yard maintains night watchman service and takes every normal precaution for the safety and care of the boat. We cannot be responsible for fire, theft, vandalism, and damage.

check the vessels' water lines. The gates to the yard were customarily left open twenty-four hours a day since many of the yachts' owners stayed aboard their ships at the marina during the night. Goudy & Stevens personnel testified that the shipyard had never experienced any serious problems with vandalism.

On June 26, 1985, the WARRIOR was launched. The decision to launch the yacht was made even though work remained to be done, specifically with respect to certain hoses and clamps which were not yet installed. The operation was directed by Gene Huskins, Goudy & Stevens' yacht supervisor, with Douglas and several other Goudy & Stevens employees assisting in the process. After the launching was completed, the vessel was secured to a floating dock by four lines on the yacht side of the yard, and remained so moored for the following two days. No problems were observed and the vessel did not appear to be taking on any water. Additional work was performed on the yacht on June 27 by both Douglas and Goudy & Stevens personnel, with Douglas being the last one to leave the vessel that day.

That night, Douglas was to pick up a principal of Cable Marine, by the name of George Cable, and the yacht's intended captain, at the airport in Portland, Maine. They returned at approximately 1:30 a.m. on June 28, proceeded directly to Goudy & Stevens, and carried out a thorough inspection of the work that had been completed up to that point. They then left the vessel shortly after 2:15 a.m.

Around 5:00 a.m. that same morning, the WARRIOR was discovered sunk at the dock. Goudy & Stevens personnel contacted Mr. Cable immediately, and he then went to the boatyard to begin planning the salvage effort. At some point it was decided that Goudy & Stevens would undertake to raise the vessel. Salvage was begun on June 29, 1985 and the vessel cleared the water toward the end of that day. After the WARRIOR was raised, a number of marine surveyors examined her in an effort to determine the cause of the sinking. Although they concluded the obvious, that the sinking was caused by ingestion of water into the hull, they were unable to determine the point of entry, and the WARRIOR never leaked at the Goudy & Stevens yard after being raised.

## II

The district court characterized the relationship between the parties as a bailment. A bailment, of course, is the delivery of goods by their owner to another for a specific purpose, and the acceptance of those goods by the other, with the express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled. 9 *Williston on Contracts*, § 1030, pp. 875–76. It has long been established that the law of bailment is applicable to suits for damages to or loss of a vessel that has been left with another for purposes of repair. *See, e.g., Buntin v. Fletchas*, 257 F.2d 512, 513 (5th Cir.1958). Thus, neither party could have reasonably taken issue with this finding of the district court, and neither has.

Appellants object to the trial court's refusal to infer appellee's negligence in carrying out its responsibilities as a bailee under the facts of this case. Generally, in order for a bailee to be held liable for damage to the bailed object, the bailor must establish that the bailee acted negligently in the performance of its duties and that its negligence was the proximate cause of the damage. *Cf. Commercial Molasses Corp. v. N.Y. Barge Corp.*, 314 U.S. 104, 110, 62 S.Ct. 156, 160, 86 L.Ed. 89 (1941). However, "when the bailor shows delivery to a bailee and the bailee's failure to return the thing bailed, he makes out a *prima facie* case of negligence against the bailee," and it "then becomes the duty of the bailee to come forward with the evidence to explain [its] default by showing facts and circumstances sufficient in law to exonerate [it] from liability for the damage." *Chanler v. Wayfarer Marine Corporation*, 302 F.Supp. 282, 285, 1969 A.M.C. 1435, 1439 (D.Me.1969) (quoting *Trawler Jeanne d'Arc v. Casco Trawlers*, 260 F.Supp. 124, 138 (D.Me.1966)). The rationale for such an inference of negli-

gence is a sound one: since the bailee is generally in a better position than the bailor to ascertain the cause of the loss, the law lays on it the duty to come forward with the information it has available. *Commercial Corp.,* 314 U.S. at 111, 62 S.Ct. at 161. This norm would appear to be controlling here unless, of course, an exception to the same exists. The trial court found such an exception in the Second Circuit's decision in *United States v. Mowbray's Floating Equipment Exchange,* 601 F.2d 645 (2d Cir.1979), which held that no inference or presumption of negligence can arise against a bailee if "[its] possession of the damaged bailed property was not exclusive of that of the bailor." *Id.* at 647 (citations omitted). We add that the fact that the bailee's possession over the thing bailed must be exclusive for the presumption to apply does not mean that any act of dominion by the bailor over the vessel would also negate the inference.[3] Rather, it implies that possession and control must be of such a nature as to permit a reasonable trier of fact to infer that the bailee is in the better, or sole, position to explain what actually happened. The trial court found that, since both parties had equally unrestricted access to the vessel at all times, there was no basis for an inference of negligence and consequently put appellants to their proof.

■ We find no fault in the reasoning of the district court. From the moment that the bailment was established to the very day the vessel sank, an agent for the bailor, Mr. Robert Douglas, had access to the WARRIOR virtually every day. His activities aboard the WARRIOR clearly amounted to more than just "mere access" to the vessel, *see* footnote 3, *supra,* as his responsibilities as a repairman were substantial. Even though their tasks were admittedly

different, he worked shoulder to shoulder with appellee's employees and expended substantially more work hours aboard the vessel than they did. The manner in which both parties cooperated in the launching process further evinces the control they each exercised over the vessel during this period. Moreover, appellants' mechanic, Mr. Douglas, was the last one to work on the yacht the day before the vessel sank. Thereafter, appellants themselves thoroughly examined the condition of the vessel just hours before the sinking. Thus, appellee was in no better position than the appellants to ascertain the cause of the sinking, and the basis for the presumption fails. Under these circumstances, we hold that the district court did not err in concluding that appellants were not entitled to an inference of negligence against the appellee.

■ Unaided by the presumption they so earnestly attempted to secure, appellants then bore the burden of proof to establish that the appellee acted negligently and that its negligence was the proximate cause of the damage. To that end, they advanced a theory in which appellee's negligence was based on its failure to provide twenty-four hour security for the premises, an omission which allegedly enabled vandals to enter the yard and damage their ship. The district judge rejected appellants' version of the events and concluded that, on the basis of the evidence then before the court, the cause of the sinking could not be determined and thus could not be attributed to the action of vandals or, by implication, to the appellee. Determinations with respect to negligence and causation constitute findings of fact and are reviewed only for clear error. *Puerto Rico Ports Authority v. M/V Manhattan Prince,* 897 F.2d 1, 3 (1st Cir.1990).

---

**3.** Other courts have held that mere access to the vessel by the bailor or its agents prior to the damage or loss does not affect the presumption. *See, e.g., Pan–American Petroleum Transportation Co. v. Robins Dry Dock & Repair Co.,* 281 F. 97 (2d Cir.1922) (that agents for the bailor were on board at the time the damage occurred did not change fact that bailee had exclusive possession of vessel under contract for repairs); *Harrison Bros. Drydock v. J.R. Atkins,* 193 F.Supp. 386

(S.D.Ala.1961) (same); *Johnson's Branford Boat Yard v. The Yacht Altair,* 260 F.Supp. 841 (D.Conn.1966) (same, where owner had visited and inspected the vessel the day of the sinking); *The English Whipple Sailyard v. The Yawl Ardent,* 459 F.Supp. 866 (W.D.Pa.1978) (same, where owner and his family had slept on the yacht on one previous occasion and there was evidence that vessel had been under power on several occasions prior to its sinking).

■ Even assuming, *arguendo*, that appellee was negligent in not providing round-the-clock security for its shipyard,[4] Goudy & Stevens cannot be held liable for the damages suffered by the WARRIOR for two reasons. First of all, we agree with the district court that appellants failed to show by a preponderance of the evidence that an act of vandalism was in fact the cause of the sinking. It is true that, relying on the fact that one of the yacht's seacocks (which should have been closed at the time of the launching and would not have been opened by anyone prior to the vessel's sinking) was not air tight when tested several days after the sinking, expert witnesses called by the appellants theorized that a vandal could have unfastened a hose connection on an engine room seacock and allowed the ingestion of a significant amount of water into the vessel within a short period of time. However, an explanation for the condition of the seacocks existed, since other tests had been performed on them prior to the time when appellants' experts had an opportunity to examine them. Appellant's theory also presumed some improbable circumstances, since the fact that no open valves were found on the vessel after it was raised would suggest that the vandal took time to conceal his actions and such concealment by way of the reconnection of the hoses would have called for him to operate underwater while the engine room was rapidly flooding, a somewhat unlikely situation. Finding no plausible motive for said course

of conduct, the district court rejected appellants' vandalism theory, and we find its analysis most convincing, and certainly sufficient to pass the clear error test.[5] If the sinking was not caused by an act of vandalism, it follows that the fact that the boatyard did not maintain twenty-four hour security is irrelevant and cannot be the source of any legal consequences.

■ Secondly, even had there been a finding that a twenty-four hour watchman was required and that an act of vandalism in fact caused the sinking of the WARRIOR, there is also no clear error in the district court's conclusion that appellants failed to prove by a preponderance of the evidence that any such negligence proximately caused the vessel's sinking. While it was possible that a nightwatchman could have detected some suspicious circumstance around the vessel and in some way prevented the sinking, it was equally possible that the loss could have befallen unnoticed by any security guard or detected at a time when his efforts to save the vessel would have been futile. Appellants presented no hard evidence which would have allowed a reasonable trier of fact to accept one theory over the other. The acceptance of one thesis would thus have required the rejection of another equally probable theory, and the district court did not clearly err in declining to solve the case on the basis of mere conjecture or speculation. Under the preponderance of the evidence standard, appellants' burden was to

---

4. There was considerable dispute at trial over whether the boatyard's failure to provide twenty-four hour watchman services constituted negligence. On the one hand, appellants argued that the yard's past practice, the value of the ships, the free access to the yard, and the fact that the yard advertised and charged overhead for night watchman services supported a finding of negligence against the appellee. On the other hand, appellee countered that lack of a night watchman cannot constitute negligence unless the conditions dictate the need for such a measure and that no such conditions existed here. The district court itself found that "ordinary and reasonable care [did not] dictate that Goudy & Stevens employ a night watchman." Given the grounds on which we base our decision, however, we need not reach this question today.

5. As additional evidence for their position, appellants contend that the finding of the Kohllenberg horns at a place removed from where most other items were found further suggested the presence of a vandal. The district court rejected this contention based on the fact that evidence of the horns' buoyancy could have been presented by the appellants but was not, and thus the court lacked sufficient evidence on which to reach such a conclusion. Before us, appellants now contend that this finding was clearly erroneous. Even had the court considered the finding of the Kohllenberg horns a suspicious circumstance suggestive of the presence of a vandal, we believe the improbable circumstances surrounding appellants' vandalism theory effectively defeated any conclusion along that line.

show that the absence of a watchman "more likely than not" caused the sinking, and they simply could not do so.

### III

Responsibility for the loss of the WARRIOR cannot be established on the basis of the record presented before the district court. Simply stated, the trial court was not put in a position to determine the cause of the sinking. Its decision is therefore,

*Affirmed.*