# United States Court of Appeals
## For the First Circuit

---

No. 00-2004

FEDERAL MARINE TERMINALS, INC.,

Plaintiff, Appellee,

v.

WORCESTER PEAT COMPANY, INC.,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, Chief U.S. District Judge]

---

Before

Boudin, Chief Circuit Judge,

Lynch and Lipez, Circuit Judges.

---

Michael X. Savasuk for appellee.
Charles E. Gilbert, III, Christopher L. Dalton, Gilbert & Greif, P.A., William H. Welte, and Welte & Welte, P.A. for appellant.

---

August 27, 2001

---

**LIPEZ, Circuit Judge**.  This appeal arises from a payment dispute between Worcester Peat Company (Worcester Peat) and Federal Marine Terminals (FMT) over a stevedoring contract. FMT contracted to load peat for Worcester Peat onto a vessel for shipment to Europe.  After the loading was completed, the parties disagreed about the contract's provision regarding the calculation of FMT's fee.  FMT charged Worcester Peat for the volume of peat it handled through the port based on the number of truckloads Worcester Peat had delivered and the volume of peat in each truck.  However, Worcester Peat based its payment on the quantity of peat calculated by reference to the box volume, or total cubic capacity, of the vessel, a sum significantly less than the amount of FMT's invoice.  The district court found that the contract unambiguously stated that FMT was to be paid by the volume of peat handled, and not by the box volume of the shipping vessel, and entered judgment against Worcester Peat for nearly $80,000.  The court also rejected Worcester Peat's counterclaim for peat it alleges was lost during the loading process.

On appeal, Worcester Peat challenges the district court's determination that the contract was unambiguous and argues that the court also erred in not charging FMT for

demurrage and for peat Worcester Peat claims was lost due to FMT's negligence in the loading process. Finding no error in the district court's rulings, we affirm.

## I.

Worcester Peat, a company located in Deblois, Maine, grows and sells peat moss. In September 1998, Worcester Peat began exploring the possibility of selling peat to buyers in Europe. With the assistance of a Finnish broker, Mikko Valli, affiliated with an Estonian company called BioMix, Ltd., Worcester Peat agreed to sell peat to Blumenerdenwerk Stender GmbH (Stender), a German company. The contract provided that Stender would be responsible for chartering a ship to load the peat in Maine and transport it to Europe. Stender contracted with another German company, Schulte & Bruns, to secure a vessel. The contract between Worcester Peat and Stender established an anticipated loading time of five days for the shipment of peat. Worcester Peat's contracts with both BioMix and Stender provided that the cost of the peat would be calculated by reference to "box volume" of the ship, or its total capacity in cubic meters.

Worcester Peat then entered negotiations with FMT, the owner and operator of a cargo terminal in Eastport, Maine, to load the peat onto the vessel chartered by Stender from Schulte

-3-

& Bruns.  Roland Rogers, general manager of FMT, testified that FMT had never worked with peat and was unfamiliar with its properties.  The parties exchanged a series of communications in the fall of 1998 regarding FMT's prices and the plans for loading the vessel.  FMT and Worcester Peat agree that their understanding during this negotiating process was that Stender would provide a "geared" vessel, meaning one equipped with cranes and other machinery for loading the peat.

On December 10, FMT was informed that the vessel involved would not be a geared vessel as expected, but rather a non-geared vessel that would not be carrying the equipment needed to load the peat from the dock onto the ship.  FMT attempted to locate cranes and other equipment to load the vessel.  After a conversation between Rogers and Morrill Worcester, president of Worcester Peat, Worcester Peat agreed to share in the cost of renting a crane up to the amount of $2100.

Worcester Peat and FMT signed the stevedoring contract on December 24.  That document provides, in relevant part: "Federal Marine Terminals Inc., Eastport hereby agrees to handle your cargo of peat moss totaling 27,000 cubic meters, approximately, for $4.95 dollars in U.S. funds per cubic meter handled through Eastport including the loading of the vessel."

The contract also established a sliding fee scale such that the price per cubic meter would be lowered if FMT achieved a specified loading rate. Finally, the contract provided, as the parties agreed, that Worcester Peat would pay up to $2100 for the rental cost of the crane.

The vessel charted by Stender, the M/V BORIS LIANOV, arrived in Eastport on the night of December 30, 1998. FMT began loading the peat early the next morning. The weather conditions during the loading of the peat were exceptionally cold and windy. There was also precipitation in the form of both rain and snow, which caused the top layer of the peat to freeze. The wind blew so much peat into the air that visibility was limited at times. The ship's captain ordered the doors of the holds closed a number of times due to wind and snow. The ship's logs also indicate that loading was stopped on some occasions at the request of Worcester Peat.

Two conveyor belts were used to load the peat into the ship's holds. Rogers testified that the intense cold created problems with the hydraulics of the conveyors, making it difficult to raise and lower them to align with the ship as the tide rose and fell. One conveyor belt became completely inoperable halfway through the loading process. Some of the

peat also froze, making it necessary to break up large chunks before the peat was put on the conveyor belts.

After FMT began loading the vessel, Worcester Peat offered FMT the use of a clamshell bucket, which FMT attached to a crane.  The bucket was used to pick up peat from the loading area on the dock and dump it directly into the holds of the ship.  FMT experienced fewer weather-related problems with the use of the clamshell bucket because the peat in the bucket was not as exposed to the wind as the peat on the conveyor belts. Worcester Peat also suggested that FMT cover segments of the conveyor belts with tarps to minimize the amount of peat blown away by the wind.

The M/V BORIS LIANOV contained seven cargo holds.  FMT loaded peat into them one hold at a time, shutting the doors for each hold after the hold had been filled with peat.  However, FMT found that the peat "settled," or recompressed, in the holds after loading, reducing its volume and requiring FMT to open the holds again and load more peat until the holds were full, a process that further slowed the loading.  The work was finally completed on January 10, six days later than the five-day loading period anticipated by Worcester Peat and Stender.

FMT sent Worcester Peat an invoice for $182,794.59. Rogers testified that he arrived at this figure by using

information Worcester Peat supplied him regarding how many trucks brought peat to the terminal (425) and the average volume per truck (115 cubic yards or 86.89 cubic meters). Multiplying those figures, he concluded that FMT had handled 36,928.2 cubic meters of peat at the agreed-upon price of $4.95 per cubic meter, for a total of $182,794.59. However, Worcester Peat paid FMT only $111,720.89. This figure relied upon the box volume of the vessel, 26,917.1 cubic meters. Although Worcester Peat added $2100 as agreed for the rental of the two cranes, it deducted $2500 as a rental charge for the clamshell bucket it had offered to FMT, as well as a demurrage charge[1] of $21,118.75 that it had paid to Stender.

Invoking the district court's admiralty jurisdiction, see 28 U.S.C. § 1333, FMT filed a complaint against Worcester Peat on June 17, 1999, seeking recovery for the difference between the amount FMT charged and the amount Worcester Peat paid (approximately $70,000). Worcester Peat filed a counterclaim alleging that FMT was liable for peat lost during the loading process.

---

[1] "'Demurrage' is renumeration of a shipowner for the detention of its vessel beyond the number of days allowed by the charter party." TAG/ICIB Servs., Inc. v. Pan Am. Grain Co., Inc., 215 F.3d 172, 174 n.1 (1st Cir. 2000) (citing Black's Law Dictionary 432 (6th ed. 1990)).

Following a three-day bench trial, the district court found that the contract between FMT and Worcester Peat unambiguously stated that payment was to be calculated using the volume of peat handled and not, as Worcester Peat contended, the box volume of the vessel. Accordingly, the district court found that FMT was entitled to a total of $190,935.57.[2] The court further held that Worcester Peat was not entitled to deductions either for FMT's use of the clamshell bucket[3] or for the demurrage charged to Worcester Peat by Stender. Finally, the district court found that Worcester Peat could not recover on any of its counterclaims because it had not established by a preponderance of the evidence either the amount of peat lost because of wind or the fact that FMT's negligence caused that loss, or that any such loss exceeded Worcester Peat's expected loss due to wind in the normal course of handling peat. Subtracting the amount Worcester Peat had already paid to FMT,

---

[2] This figure is larger than the amount calculated by Rogers for two reasons. First, the district court found that Worcester Peat had delivered 434 trucks of peat to the terminal, not 425 trucks as Rogers had thought. Second, the district court found that the conversion factor Rogers used to convert cubic yards to cubic meters was incorrect. Accordingly, the court used a conversion of 87.9 cubic meters of peat per truck instead of 86.89 cubic meters per truck as Rogers calculated.

[3] Worcester Peat has not appealed the district court's determination with respect to the clamshell bucket.

the district court entered judgment in favor of FMT in the amount of $79,214.68.

Worcester Peat appeals the judgment of the district court on three grounds. First, it argues that the court erred in finding that the contract unambiguously provided that FMT would be paid according to the volume of peat handled. Second, Worcester Peat claims that the court should have found FMT liable for demurrage it was charged by Stender because FMT did not load the vessel in a timely fashion. Finally, Worcester Peat says that the district court erred in not holding FMT responsible for amounts of peat lost in the wind during the loading process.

## II.

### A. Interpretation of the Contract

A court sitting in admiralty jurisdiction applies federal maritime rules. See Greenly v. Mariner Mgmt. Group, Inc., 192 F.3d 22, 25-26 (1st Cir. 1999). See also Har-Win, Inc. v. Consolidated Grain & Barge Co., 794 F.2d 985, 987 (5th Cir. 1986). Therefore, we turn to principles of general maritime contract law to determine whether the contract between FMT and Worcester Peat was ambiguous. See Garza v. Marine Transport Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988). The district court found that "[t]he language of the contract

-9-

unambiguously called for Worcester Peat to pay FMT $4.95 per cubic meter handled."  We review this determination de novo. See ITT Corp. v. LTX Corp., 926 F.2d 1258, 1261 (1st Cir. 1991).

"A word or phrase is ambiguous when it is capable of more than a single meaning."  Garza, 861 F.2d at 27.  The contract between FMT and Worcester Peat provided: "Federal Marine Terminals Inc., Eastport hereby agrees to handle your cargo of peat moss totaling 27,000 cubic meters, approximately, for $4.95 dollars in U.S. funds per cubic meter handled through Eastport including the loading of the vessel."  (emphasis added.)  Notably, the contract does not mention box volume, or the ship's total capacity, at all, and nothing in the contract itself suggests that box volume would be the basis for calculating FMT's fee.

Having concluded correctly that the "handled" language of the contract was unambiguous, the district court applied that language to the facts of the case: "Although the contract clearly calls for Worcester Peat to pay FMT based on the amount handled, determining the amount handled requires me to choose between contradictory evidence."  That contradictory evidence related to "the numbers of trucks that delivered peat to the terminal as well as various estimates on the amount each truck

held."  The court resolved those contradictions and made the appropriate calculations.  Worcester Peat insists, however, that the court's decision to calculate the amount of peat handled on the basis of truck deliveries overlooks an ambiguity in the contract because the volume of peat handled could just as easily be measured by the amount that was actually placed into the holds of the ship.  The district court properly rejected this attempt to create an ambiguity where none exists.  FMT obviously had to handle the peat that was delivered to its terminal by Worcester Peat.  The district court sensibly viewed truck deliveries as the most accurate measure of the amount of peat FMT had to handle pursuant to the contract.

Worcester Peat further claims that the district court's finding that the contract is unambiguous ignored the clause that established the following sliding scale for payment:

> Should the loading of the vessel be accomplished at an average gross production scale of greater than 350 cubic meters per hour we will refer to the sliding scale that has been provided.  This scale would incrementally reduce the total cost to Worcester industries by up to $0.08 (eight cents) per cubic meter maximum at 440 cubic meters per hour.

Worcester Peat contends that the only way to determine whether this production incentive had been met was to reference the volume of peat loaded onto the vessel.  Therefore, Worcester

Peat argues, the phrase "per cubic meter handled through Eastport" in the clause specifying FMT's payment is ambiguous because the contract required the use of box volume to determine whether the sliding fee scale would apply. We need not decide whether Worcester Peat's interpretation of the sliding fee scale is correct because that provision - even under Worcester Peat's reading of it - does not conflict with the conclusion that the contract unambiguously provided for payment according to volume of peat handled. Even if, as Worcester Peat contends, the sliding scale could only be calculated by reference to box volume of peat in the vessel, the reduced fee established by the sliding scale could still be applied to calculate FMT's fee according to the volume of peat handled through the port. Accordingly, nothing in the sliding fee provision changes our conclusion that the district court's reading of the contract was correct.

Unable to locate language in the contract to bolster its assertion that the term "handled" is ambiguous, Worcester Peat identifies other evidence in the record referring to the vessel's box volume of peat. For example, Rogers stated in a communication to Valli dated October 21, 1998: "The difficulty in determining the volume of cargo handled, I believe, dictates that we calculate using box volume." Worcester Peat also argues

that because its contracts with Biomix and Stender calculated payment according to the box volume of peat, the district court reached a "manifestly absurd result" in finding that FMT's fee would be calculated according to volume of peat handled. Finally, Worcester Peat claims that documents signed by Rogers on behalf of FMT, including the bill of lading and the mate's receipt for the M/V BORIS LIANOV, measured the cargo by box volume.

However, the district court correctly decided that these documents were irrelevant to its consideration of whether the contract between FMT and Worcester Peat was ambiguous: "[T]he shipping documents refer to box volume, because the shipping documents necessarily measure what is on the vessel. They have nothing to do with stevedoring contracts."  Moreover, the district court's consideration of this extrinsic evidence was precluded by the parol evidence rule:

> The purpose and essence of the [parol evidence] rule is to avoid the possibility that fraud might be perpetrated if testimony as to subjective intent could be substituted for the plain meaning of a contract.  In the absence of ambiguity, the effect of admitting extrinsic evidence would be to allow one party to substitute his view of his obligations for those clearly stated.

Garza, 861 F.2d at 26-27 (internal quotation marks omitted). Having concluded that the contract between Worcester Peat and

-13-

FMT unambiguously provided that FMT's payment would be calculated by reference to cubic meters of peat handled through Eastport, the district court properly refused to consider evidence of any negotiations or extrinsic documents to alter that language. See Har-Win, Inc., 794 F.2d at 987 ("[E]vidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."); Battery S.S. Corp. v. Refineria Panama, S.A., 513 F.2d 735, 739-40 (2d Cir. 1975) (stating, in interpreting a contract governed by maritime law, that the parol evidence rule "renders legally inoperative . . . evidence of prior understandings and negotiations which contradicts the unambiguous meaning of a writing which completely and accurately integrates the agreement of the parties").

**B. Demurrage**

The district court concluded that FMT was not liable for demurrage costs of $21,118.75 that Worcester Peat paid to Stender. The agreement between Stender and Schulte & Bruns, the company from whom Stender chartered the M/V BORIS LIANOV, provided that the vessel would be loaded in five days. Because the loading of the peat exceeded this period by several days, Schulte & Bruns charged Stender for demurrage, and Stender in turn charged Worcester Peat. Worcester Peat and FMT were not

-14-

signatories to the contract providing that the loading would take only five days.

The contract between FMT and Worcester Peat does not mention demurrage or even provide a time frame for loading the chartered vessel. As the district court found, "Worcester Peat has not introduced any evidence showing that FMT was party to, knew about, or was in possession of a document referring to demurrage." We have said previously that "courts have been reluctant to impose demurrage liability on a party that is neither a signatory, successor nor possessor of a document that expressly or by incorporation refers to demurrage." Trans-Asiatic Oil Ltd., S.A. v. Apex Oil Co., 804 F.2d 773, 781 (1st Cir. 1986). As the district court noted, there is no evidence in the record that FMT was a party to the contract between Worcester Peat and Stender or to the contract between Stender and Schulte & Bruns.[4] Rogers acknowledged at trial that FMT had received a fax from Dean Worcester indicating that 120 hours were allowed for loading the vessel. However, there is no

_____

[4] We also note that, although Worcester Peat paid Stender for demurrage, the contract between those two parties did not provide for such a payment in the event that the loading of the peat exceeded the projected time period. The agreement between Worcester Peat and Stender only established an accepted loading time of 120 hours for a vessel the size of the M/V BORIS LIANOV and did not even raise the possibility that Worcester Peat would be charged for not meeting that guideline.

evidence that Rogers realized that demurrage might be charged if the loading exceeded that time.  Under these circumstances, the district court correctly declined to find FMT responsible for the demurrage that Worcester Peat paid to Stender.

Worcester Peat also argues that FMT should be liable for demurrage because FMT breached its duty of workmanlike performance by not loading the M/V BORIS LIANOV more quickly.  See, e.g., F.J. Walker Ltd. v. Motor Vessel Lemoncore, 561 F.2d 1138, 1148 (5th Cir. 1977) ("A stevedore owes a warranty of workmanlike performance to the vessel.").  However, the contract between FMT and Worcester Peat did not establish a time limit on FMT's loading of the peat onto the vessel or even provide a suggested guideline.  In the absence of such a provision in the contract, FMT was required to load the vessel in a reasonable amount of time.  The district court found that the time FMT spent loading the M/V BORIS LIANOV was reasonable under the circumstances:

> At trial none of the evidence or testimony suggested that the pace at which FMT loaded the vessel was unreasonable under the circumstances.  Rather, all of the evidence painted a picture of FMT simply doing the best it could to load the peat under the unexpectedly harsh conditions.  Although FMT may not have foreseen the problems posed by using conveyors in the weather conditions that existed, FMT attempted to address the problems as they arose and implemented the

-16-

suggestions of Worcester Peat's representatives to the extent possible.

Worcester Peat has not even attempted to demonstrate that this determination was clearly erroneous. Indeed, Worcester Peat concedes that the weather conditions were unusually harsh and that those conditions complicated the loading of the peat. Moreover, the weather was so harsh that Worcester Peat itself caused delays in the loading by ordering that loading be stopped to prevent losses of peat due to wind. Accordingly, we find no clear error in the district court's conclusion that FMT's loading time was reasonable under these circumstances.

## C. Worcester Peat's Counterclaim for Lost Peat

Worcester Peat alleged unsuccessfully in its counterclaim that FMT was liable for amounts of peat lost during the loading process. On appeal, Worcester Peat first argues that we should find clearly erroneous the district court's ruling that Worcester Peat failed to establish how much peat was lost through FMT's negligence. The district court stated:

> Although the evidence established that some unquantified amount of peat was airborne at the terminal and that some smaller unquantified amount of peat actually was blown into the water, Worcester Peat failed to provide any reliable evidence of how much peat was lost. Moreover, Worcester Peat expected to lose some peat during the loading process. Worcester Peat failed to establish that the amount lost was beyond

-17-

what it anticipated.  This failure makes it impossible to calculate damages.

Witnesses for both Worcester Peat and FMT testified that some of the peat was blown off the conveyor belts during the loading process.  Morrill Worcester estimated that twenty to twenty-five percent of the peat brought to the loading dock did not make its way into the vessel.  Another Worcester Peat employee estimated the loss of peat at twenty percent.  However, both witnesses acknowledged the difficulty of calculating with certainty the amount of peat lost in the wind.  When Morrill Worcester was asked, "Are you able to estimate based on your observations an amount of peat that was lost overboard?" he stated:

> I really - you know, I think you have to do it through a process of deduction probably. It's hard to say.  The way I understand it, I think there was 425 trailer loads of peat, and you'd have to come up with a number of cubic yards or cubic meters on each trailer, and in the stock pile that we have, the peat moss is kind of semi-compressed as it is. And if you - it's just hard to say.  I don't know how you come up with a figure, but it was considerable.  Probably 20, 25 percent possibly went overboard or went somewhere. I don't know.  Maybe in the bushes, in the woods, overboard, into the ocean, and everywhere else.

As Morrill Worcester's testimony indicates, several factors complicated the task of calculating the exact quantity of peat lost in the wind.  Because the volume of peat changes depending

on how much it is handled, Worcester Peat cannot rely on a comparison of the volume of peat delivered off the trucks with the volume of peat in the ship's holds.

Additionally, as the district court noted, Worcester Peat expected to lose some peat even in perfect loading conditions. Dean Worcester testified that peat is generally lost due to wind whenever it is handled or moved from one location to another because it is so light and fluffy. Worcester Peat did not offer any evidence regarding how the claimed loss of up to twenty-five percent exceeded the loss of peat the company expected in the ordinary course of handling it. Given the speculative testimony about how much peat was lost, and Worcester Peat's failure to specify how much that loss exceeded its expectations, the district court was not clearly erroneous in declining to hold FMT responsible for an unquantified loss of peat.

Worcester Peat also argues that the district court erred in not shifting the burden to FMT to prove that it was not negligent in handling the peat. Contending that FMT was a bailee of the peat, Worcester Peat says that FMT should account for the peat that was lost in the wind because FMT, as the party in control of the peat, is in a better position than Worcester Peat to marshal evidence to explain the loss of peat. See Goudy

& Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 19 (1st Cir. 1991) ("[S]ince the bailee is generally in a better position than the bailor to ascertain the cause of the loss, the law lays on it the duty to come forward with the information it has available."). The district court found that even if "the relationship between Worcester Peat and FMT could be described as a bailment because FMT stored the peat prior to loading it on the vessel, Worcester Peat has failed to establish by a preponderance of the evidence that FMT did not load all of the peat less the amount Worcester Peat anticipated losing during the loading process." For the reasons we have explained, the district court was not clearly erroneous in finding that Worcester Peat failed to establish how much peat was lost, if any. Therefore, Worcester Peat failed to establish a prima facie case of negligence against FMT. See id. at 18 ("[W]hen the bailor shows delivery to a bailee and the bailee's failure to return the thing bailed, he makes out a prima facie case of negligence against the bailee.") (internal quotation marks omitted). Under these circumstances, the district court did not err in declining to apply a presumption of negligence for FMT to refute.

**Affirmed**.