# United States Court of Appeals
## For the First Circuit

Nos. 08-2156
     08-2246

NORTHERN INSURANCE COMPANY OF NEW YORK; NICHOLAS PICCHIONE,
          Plaintiffs-Appellants/Cross-Appellees,

v.

POINT JUDITH MARINA, LLC,
     Defendant-Appellee/Cross-Appellant,

ALBIN MANUFACTURING, INC., STANDISH BOATYARD, INC.,
               Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella, Circuit Judge,
and Ebel,[*] Senior Circuit Judge.

Frederick A. Lovejoy, with whom Lovejoy & Associates, was on
brief for appellants/cross-appellees.
Michael J. Rauworth, with whom Carl E. Fumarola and Cetrulo &
Capone LLP, were on brief for appellee/cross-appellant.

August 27, 2009

---

[*]  Of the Tenth Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** After a bench trial, the district court entered judgment for defendant Point Judith Marina ("PJM") on claims for damages by plaintiff Nicholas Picchione and subrogee-plaintiff Northern Insurance Company of New York ("Northern"). The claims arose as a result of the sudden sinking of a recreational boat ("Eveready") owned by Northern's insured, Picchione. The district court also rejected PJM's counterclaim against Picchione for attorney's fees based on a slip rental agreement between Picchione and PJM. Each of these parties appeals the unfavorable aspects of the judgment. After careful review, we affirm in all respects.

## I. Background

Picchione bought Eveready in 1996 from Standish Boatyard, Inc. ("Standish"). Eveready is a 35-foot vessel made by Albin Manufacturing, Inc. ("Albin"). It is undisputed that, as purchased, the vessel's exhaust hoses ran through the hull over a plywood bulkhead without any chafing gear or strain relief. And the engine room's bilge pumps did not include anti-siphon loops or check valves, features which would prevent or limit backflow of water through the exhaust. These precautions are recommended by the American Boat & Yacht Council ("ABYC"). As detailed below, plaintiffs assert that these alleged design deficiencies led to Eveready's sinking.

Picchione docked his boat at PJM. PJM also undertook to store the boat on land in the winter, commission it in the spring, and decommission it in the fall. In the course of these activities, PJM conducted repairs on some of the boat's components. Nonetheless, in a finding at issue on this appeal, the district court concluded that "aside from work that [PJM] contracts to perform specifically, it does not provide general preventative maintenance or care for the vessels in the Marina."

During the 2004-2005 off-season, Picchione hired "Dan," an independent mechanic, to work on Eveready's engines. Then, on April 21, 2005, PJM moved the vessel to its slip. PJM employee Joseph Stroker worked on commissioning Eveready on Friday, April 22, 2005.[1] PJM refused to work on the engine as part of the commissioning because of Dan's work. PJM also refused to conduct a sea-test of Eveready until Dan tested the engines. But Stroker did examine the bilge pumps. He noticed six to eight inches of water in the bilge, which he pumped out. After pumping, he noted that the engine room bilge would not stop running. He then turned off what he insists was the engine room bilge pump by switching one of three switches to the off position. Consistent with his notes made at the time, Stroker testified that he left the automatic

---

[1] Plaintiffs suggest that Stroker may have been on the vessel the next day, since his work slip indicated he worked for 13.4 hours. But plaintiffs point to no evidence clearly establishing the proposition that he worked on Saturday. Rather, Stroker's testimony suggests otherwise.

bilge pump switch on and that he tested to make sure a bilge would activate.

Picchione visited the boat on April 21, 22, and 23 to stock the vessel. Picchione testified that he checked the automatic bilge switch on April 22 and that it was on. He further testified that he did not recall checking it or the water in the bilges on April 23. The district court found this testimony inconsistent with his deposition, where he testified that he always checked the bilges for water, and would have done so on Saturday, April 23. He also said at deposition that he would have left the automatic bilge switch turned on.

No evidence showed that anyone else boarded Eveready after Picchione, though Picchione admitted that his friends occasionally boarded the boat without checking with him first. On the evening of Sunday, April 24, another marina-goer did not notice anything wrong with Eveready as she sat in her slip. That individual awoke the next morning to see the vessel gone and replaced by a spreading oil slick. By that afternoon, Eveready was hauled from the bottom and inspected. During an inspection that day, the harbormaster noticed the bilge pump switches were all in the off position. At a joint survey conducted on May 3, with experts representing both sides, a small steady stream of water was observed running down the starboard interior hull in the engine compartment. The source of the leak could not be determined at the

time.  The vessel was reconditioned and re-hauled in October 2007. At that time, no water was observed entering.  During reconditioning, when the fuel tanks were removed, a cut was found in the bottom side of the starboard exhaust hose.  Evidence showed that the cut would not have been visible without removing the fuel tanks and disassembling the exhaust system.  Northern theorizes that the cut was caused by the lack of anti-chafing gear at the point where the hoses passed through the hull.

Northern, through its expert, posits that water entered the vessel through this leak.  PJM took the position that the hole could not have caused the leaking.  The district court did not resolve this dispute, but concluded that whatever the source of the initial leak, water began to accumulate in the bilge and the vessel sank in the water until the exhaust portal became submerged,[2] causing significant back-flooding, which led to the boat's sinking. Expert testimony established that one working bilge pump would have prevented this chain of events.

After Northern paid money to Picchione under an insurance policy between the two of them, these two parties filed a complaint against PJM, Standish, and Albin.[3]  The complaint invoked the

---

[2]  Some evidence suggested that Eveready normally sat in the water with her exhaust portals submerged or partially submerged.  This issue will be discussed below.

[3]  Default judgment ultimately entered against Albin.  Standish settled on the eve of trial.

district court's admiralty jurisdiction, 28 U.S.C. § 1333(1), and, as amended,[4] asserted claims against PJM for failure to warn, breach of the warranty of workmanlike service, "breach of contract/negligence," and "bailment." PJM filed a counter-claim for indemnification against Picchione, based on the language of their slip rental agreement. That agreement provides, in relevant part:

> 18. Tenant hereby covenants, warrants, and agrees to indemnify and hold Marina harmless from any loss or injury, including death, to any person, including the Tenant, arising out of any incident occurring on or about the Tenant's vessel, a vessel of any patron of the Marina, or on the premises of the Marina.

PJM essentially contends that it suffered attorneys fees as a result of the sinking and that Picchione should provide indemnification for this "loss." PJM has not contended on appeal that this provision bars plaintiffs' claims against it.

The case proceeded to a five-day bench trial. The district court grouped plaintiffs' claims into two categories: those arising out of PJM's failure to detect the cause of the initial leak, and those arising out of PJM's alleged responsibility for turning off the automatic bilge pump. As to the first group, the district court held plaintiffs' tort claims barred by the

---

[4] An amended complaint later listed only Northern as a plaintiff in the caption, but continued to name Picchione as a plaintiff elsewhere. In light of this confusion, and in light of PJM's counterclaim against Picchione, the district court continued to view Picchione as a plaintiff and counter-defendant.

economic loss doctrine. It further found no evidence of a specific contract for "inspection, general maintenance, and repair of all the vessel's component parts" and no evidence "to support the proposition that such alleged defects should have been discovered and corrected as part of the general warranty of workmanlike performance." The district court deemed the ABYC recommendations non-binding and found that PJM never agreed to perform preventative maintenance.

As to the claims related to the bilge pump, the district court first concluded it would not apply a presumption against PJM based on bailment law since PJM did not have exclusive control of the vessel. The district court then concluded that someone had turned off the automatic switch, but that the court "simply cannot conclude with any certainty who turned off the automatic bilge pump switch, and when." The court concluded that Northern had not met its burden to show that PJM's agent, Stroker, was responsible. Specifically, the court relied on Picchione's admission at deposition that he would have checked when he was on the boat on Saturday that the automatic pump was on. Given that, the court could not find by a preponderance that Stroker turned the automatic pump off on Friday.

As to PJM's counterclaim, the district court reasoned that the contract pertained only to the slip rental and not to allegations of negligence in the performance of other service

contracts. Accordingly, judgment entered for PJM on plaintiffs' claims and for Picchione on PJM's counterclaims. Each side appeals.

## II. Discussion

"Where, as here, the district court conducts a bench trial and serves as the factfinder, its determinations of negligence, proximate cause, and similar issues are entitled to considerable deference." Jackson v. United States, 156 F.3d 230, 232 (1st Cir. 1998). Specifically, such review is for clear error. Id. "Thus, a trial court's factual determinations will be set aside only if, after careful evaluation of the evidence, we are left with an abiding conviction that those determinations and findings are simply wrong." Id. at 232-33 (internal quotation marks omitted). "On clear-error review, we cannot second-guess the trier's choices among those competing inferences even if, had we been sitting as triers of the facts, we might have arrived at a different set of judgments." Id. at 233; see also Anderson v. Bessemer City, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Nonetheless, we review questions of law de novo. LPP Mortg., Ltd. v. Sugarman, 565 F.3d 28, 31 (1st Cir. 2009).

Though there was some dispute in the district court about the import of the economic loss doctrine to plaintiffs' tort

-8-

claims, this case ultimately does not turn on this issue, which plaintiffs do not separately challenge on appeal. Rather, relying on PJM's obligations under the warranty of workmanlike performance, plaintiffs attack the specific conclusions of the district court. Namely, at issue is whether the district court erred (1) in finding PJM had no obligation to discover defects in Eveready, (2) in not finding PJM responsible for the disabled automatic bilge pump, (3) in making various other factual findings, and, finally, on the cross-appeal, (4) in ruling that the contract between Picchione and PJM did not provide for indemnification on these facts.

We evaluate plaintiffs' claims under federal maritime law. See La Esperanza de P.R. v. Pérez y Cía. de P.R., 124 F.3d 10, 16 (1st Cir. 1997). As discussed below, the slip rental agreement provides that it shall be governed by Rhode Island law.

### A. Did PJM have an obligation to detect defects?

Plaintiffs advance their claim under a theory that PJM breached the implied warranty of workmanlike performance inherent in federal maritime law. This doctrine provides that a maritime contractor "who contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner." Parks v. United States, 784 F.2d 20, 26 (1st Cir. 1986) (internal quotation marks omitted). "[T]he implied warranty of workmanlike performance parallel[s] a negligence standard rather than imposing . . . strict liability," but "a shipowner may receive indemnity from a marine

-9-

contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence." La Esperanza, 124 F.3d at 17 (internal quotation marks omitted). "[T]his warranty need not be express to bind the ship repairer to use the degree of diligence, attention and skill adequate to complete the task." Id. at 19 (internal quotation marks and emphasis omitted).

For example, where an agreement effectively required a party to assume maintenance, and specifically required it to "conduct a condition survey," we affirmed a district court's finding that the warranty of workmanlike performance was breached by failure to detect a defect that later injured a sailor. Parks, 784 F.2d at 27. Similarly, when a shipyard contracted to perform hull repair and held itself out as so-qualified, the shipyard was found liable for failing to complete repairs as a result of making a welding mistake which "should have been readily apparent to any reasonably competent ship repair professional." La Esperanza, 124 F.3d at 17-19.

As the district court found, this case is quite different. PJM's duties in commissioning the vessel did not obligate it to appraise the overall condition of the vessel or search for defects in hidden exhaust hoses or the design of the bilge pumps. Though the implied warranty of workmanlike performance is a legal standard, the question of what is required

in a workmanlike performance is necessarily a factual question that naturally varies from case to case based on the scope and nature of the service being undertaken. See id. at 19 (affirming a finding of breach where the "evidence in the record substantiates that similarly situated ship repairers" would have been able to properly weld the hull plates at issue); SS Amazonia v. New Jersey Exp. Marine Carpenters, Inc., 564 F.2d 5, 8-9 (2d Cir. 1977) (reviewing a maritime workmanlike performance claim and treating as a factual issue the question of how tractors should be secured for shipping). First of all, unlike in Parks, no explicit agreement of the parties provided for such an inspection. 784 F.2d at 27. In fact, plaintiffs have failed to show any written service agreement at all covering the commissioning.[5]

Second, there is no clear error in the district court's finding that no such obligation was implied. This is not to say that PJM had no implied obligations. As we have stated, our precedent provides that obligations under warranty of workmanlike performance apply to implied agreements. Nonetheless, evidence in the record, namely testimony from PJM's manager, supports the district court's conclusion that no implied obligation to fully inspect all components inheres in PJM's agreement to undertake commissioning Eveready. And plaintiffs point to no evidence which

---

[5] At oral argument, we asked Northern's counsel to file a supplemental letter addressing this point, but he failed to do so.

-11-

would clearly establish that a reasonable worker would conduct a complete inspection during commissioning.

Plaintiffs do point to certain snippets of testimony to challenge this conclusion. But in no case do they show (or even explicitly argue) that the district court's dispositive findings were clearly erroneous. Specifically, plaintiffs note that PJM's manager admitted that the commissioning process normally includes inspecting components including hoses and bilge pumps. But close examination of his testimony reveals that he simply said that a technician should report visible defects in exhaust hoses and the like, and that "[i]f we can't see items, we can't do anything about them." Thus, such testimony does not show the commissioning was meant to be comparable to a full inspection. And evidence supported the district court's conclusion that the exhaust hose hole that Northern alleges led to the initial leak was not visible. Plaintiffs argue that even if the hose hole was not visible, the absence of chafing gear would have been visible. But the district court did not so find, and the evidence does not require that conclusion. Further, even if the hoses were inspected, the evidence does not require the conclusion that the absence of chafing gear is something a workmanlike boat commissioner should have noticed.

Plaintiffs also point to PJM's manager's statement that commissioning includes checking for leaks. But, the evidence

showed that Stroker did check for water in the bilge, and pumped it out. And he reasonably did not conduct a sea test, which might have revealed further leaks, because the engines had not been tested by Dan, Picchione's independent contractor.

Next, plaintiffs suggest that there were prior occasions where PJM fixed an exhaust hose or adjusted the bilge pump during commissioning. Plaintiffs can point to a checklist from a prior commissioning which shows that PJM checked for old hoses. But the fact that PJM agents previously made repairs to a particular component does not compel the conclusion that a workmanlike commissioning process should include an inspection of such components. Rather, the district court's conclusion about the scope of PJM's responsibilities was supported by testimony from PJM's manager that PJM did not assume general responsibility for servicing vessels it commissions at its slips.

Third, plaintiffs theorize that the district court committed error by failing to put enough weight on the ABYC standards recommending certain preventative gear to guard against hose chafing and bilge pump backflow. Plaintiffs argue that PJM, as a repairer, should not be allowed to depart from industry standards. This argument fails for at least two reasons. First, this argument misses a step by assuming that PJM had an obligation to inspect for compliance with such standards. The district court did not find such inspection to be part of the commissioning

process, and for the reasons we have explained, we see no clear error. Second, even if PJM had some duty to conduct a general inspection, the standards would not automatically establish a duty to detect a lack of the specified precautions. Rather, we recognize such standards as some evidence of what a reasonable person would do, not as a definitive statement of PJM's obligations. See Getty Petroleum Mktg., Inc. v. Capital Terminal Co., 391 F.3d 312, 326 (1st Cir. 2004) ("These voluntary standards do not irrefutably establish the standard of care in a negligence case. Rather, they constitute one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of th[e] case." (internal quotation marks omitted)). Plaintiffs have not shown that the district court should have been required to accept the standards as conclusive evidence of the standard of care PJM owed Picchione.

In conclusion, we make clear that we make no per se rule about what precise obligations a boat-commissioner will owe to a boat-owner under the warranty of workmanlike performance. This is a factual question which depends on the scope of the work contemplated in the parties' explicit agreement and on obligations implied through the surrounding circumstances. Here, plaintiffs have failed to establish that PJM had explicitly or implicitly undertaken to inspect the vessel for hidden defects or compliance

-14-

with a particular standard.  Thus, plaintiffs cannot succeed on their claim that PJM's failure to do so was a breach of its implied warranty of workmanlike performance.

### B.  Is PJM responsible for the turned-off bilge pumps?

No party challenges the district court's conclusion that PJM was serving as Picchione's bailee.  Rather, the question centers around whether Picchione may benefit from a presumption of fault against his bailee.  The district court found PJM did not have "exclusive" possession of the boat and, so, refused to apply this presumption.

Generally, under bailment law, "when the bailor shows delivery to a bailee and the bailee's failure to return the thing bailed, he makes out a prima facie case of negligence against the bailee." Goudy & Stevens, Inc. v. Cable Marine, Inc., 924 F.2d 16, 18 (1st Cir. 1991) (internal quotation marks omitted).  This law essentially creates a presumption against the bailee, which can be rebutted.  See id. This presumption is based on the rationale that "since the bailee is generally in a better position than the bailor to ascertain the cause of the loss, the law lays on it the duty to come forward with the information it has available." Id. at 19.

But this rule admits an exception.  "[N]o inference or presumption of negligence can arise against a bailee if [its] possession of the damaged bailed property was not exclusive of that of the bailor." Id. (internal quotation marks omitted).  The

dispute in this case regards the term "exclusive." We have said that the requirement "does not mean that any act of dominion by the bailor over the vessel would also negate the inference." Id.; see also id. at 19 n.3 (citing cases holding that a bailor's "mere access" is insufficient to defeat the presumption). Rather, for the presumption to attach, exclusivity must only "be of such a nature as to permit a reasonable trier of fact to infer that the bailee is in the better, or sole, position to explain what actually happened." Id. Where both parties have "equally unrestricted access," a district court commits no error by rejecting the presumption. Id.

As just described, we view the question of exclusivity as one to be found by a "trier of fact," so review is for clear error. See id. Plaintiffs contend that the district court erred in finding no exclusivity because Picchione performed no work on the vessel and had mere access to it only to stock provisions. Further, plaintiffs reason, Stroker was the only one to admit touching the bilge pump switches, and PJM did not warn Picchione of Stroker's actions, so PJM is better situated to explain what happened.

But again, plaintiffs have failed to meet their high burden of showing clear error. Picchione was on the vessel on the Thursday, Friday, and Saturday before the sinking. He had equal access to and power over the bilge pump switch, which, by his own

admission, he checked on Saturday. Next, he had hired an independent mechanic who was responsible for a portion of the boat, which prevented PJM from fully exercising control. Finally, Picchione admitted that his friends had his implied permission to access the boat without his prior approval. This is not "mere access." Rather, it is the kind of activity which, through its interference with PJM's control over the boat, would cast doubt on the fairness of presuming PJM was responsible. The district court's rejection of plaintiffs' exclusivity claim was not clear error.

Plaintiffs suggest in the opening of their brief to this court that, aside from the law of bailment, the district court made a factual error in not finding Stroker responsible for turning off the automatic bilge pump. But plaintiffs fail to develop any argument as to how the district court clearly erred in reaching a contrary conclusion in reliance on Picchione's deposition testimony that he would have checked the bilge switch on Saturday. Accordingly, any such argument is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (documenting the "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## C. Do any other alleged errors require vacatur?

Plaintiffs contend that the district court's findings rely on an expert report which was never admitted into evidence. Specifically, plaintiffs point to PJM's expert's conclusion (1) that the exhaust hose could not have caused the leak and (2) that a single bilge pump would have saved Eveready. Any reliance by the district court on such testimony would be entirely harmless. The district court's holding was not based on any finding about the cause of the initial leak. In fact, the district court explicitly made no determination on that issue. As to the second conclusion, the district court did find the proposed fact: that a single bilge pump would have saved the vessel. But such testimony was entirely cumulative with Northern's own expert, who also proposed the same conclusion. These errors epitomize harmlessness, and are not a basis for reversal. See 28 U.S.C. § 2111. Plaintiffs have essentially no developed arguments of prejudice with which to challenge this conclusion.

Plaintiffs next contend that the district court erred when it (1) concluded that no evidence showed the rate of the leak before the sinking,[6] (2) stated that Northern's expert could not

---

[6]  This is also not clear error. The only testimony plaintiffs point to showed the rate of the leak after the vessel was recovered and inspected. While one could accept such testimony as circumstantial evidence of the rate of leaking before the sinking, the district court was not required to so infer, and was correct that there was no direct evidence of the pre-sinking leakage rate.

-18-

rule out another source of the leak (namely hull damage), and (3) confused testimony regarding the rear as opposed to the engine room bilge. But none of these facts are material to the dispositive questions of PJM's duty to detect defects or leaks or to PJM's liability for the turned-off automatic bilge pump.[7] So these contentions provide no basis to justify vacatur.

Finally, plaintiffs challenge the district court's finding that the sinking was caused when the boat sank to such a point that water backflowed through the exhaust ports. Plaintiffs point to some evidence showing that Eveready normally sat in the water with her exhaust ports submerged. Even if plaintiffs could show clear error, their claim here is confusing at best. It was plaintiffs' own expert who proposed the backflow theory, and one of plaintiffs' chief theories is that PJM was negligent in not detecting flaws in the bilge design that would have prevented such backflow. It is strange for plaintiffs to now challenge the district court's backflow findings. Plaintiffs are essentially arguing that the boat did not sink in the way they suggested that

_____

[7] In their reply brief, plaintiffs argue that a proper finding as to the rate of the leak, combined with evidence of a scum lime that formed on Eveready, would lead to a conclusion that the bilge pump must have been turned off before Saturday. Plaintiffs do not adequately develop this technical argument. Nor did they raise it in their initial briefs. It is waived. See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 299 (1st Cir. 2000) ("We have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are deemed waived.").

-19-

it did.  But plaintiffs propose no other explanation for the sinking, let alone a theory that would show that PJM should have detected this unspecified defect.  Therefore, plaintiffs challenge to this finding also fails on harmlessness grounds.

Plaintiffs undoubtedly hoped to tarnish the district court's conclusions by trying to cast doubt on these subsidiary findings.  But their failure to meaningfully engage the rule of harmless error review dooms their claims.

### D.  Must Picchione Indemnify PJM?

PJM essentially argues that Picchione promised, in Paragraph 19 of the Slip Rental Agreement, to indemnify PJM for "any loss," including attorney's fees, arising out of "any incident occurring on or about the Tenant's vessel . . . or on the premises of the Marina," including its sinking.  PJM challenges the district court's rejection of its indemnification counterclaim, asserting that it improperly imposed an additional limitation that the liability arise out of the Slip Rental Agreement.[8]

The parties selected Rhode Island law to govern their contract.  No party has challenged (or even mentioned) that selection, and we see no policy interest which would override this contractual choice.  Cf. Restatement (Second) of Conflict of Laws

---

[8]  We note that though PJM also cites language from another provision dealing more explicitly with attorney's fees, Paragraph 39, PJM develops no argument regarding this section.  So, any such argument is waived.

§ 187 (1971) (discussing enforcing parties' choice of law provisions); see also Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004) (noting that state rules of interpretation often govern maritime contracts absent controlling federal law on point (citing Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955))).

The construction of an unambiguous contract is a question of law, which we review de novo. Lloyd's of London v. Pagán-Sánchez, 539 F.3d 19, 22 (1st Cir. 2008); Arruda v. Sears, Roebuck & Co., 310 F.3d 13, 19 (1st Cir. 2002). Under Rhode Island law, a contract is ambiguous "if it is reasonably susceptible of different constructions." In re Newport Plaza Assoc., 985 F.2d 640, 645 (1st Cir. 1993) (internal quotation marks omitted). "Conversely, a contract which within the realm of reason can bear only a single plausible interpretation can be so construed by the court as a matter of law." Id. "Where the language of a contract is clear and unambiguous, the Rhode Island Supreme Court has generally interpreted the parties' intent based solely on the written words." Id. "[A] court is duty bound to construe contractual terms in the context of the contract as a whole." Id. at 646.

We reject PJM's position regarding Paragraph 19. While PJM's reading is clever, it is not convincing. PJM does not seek indemnity for a loss directly resulting from the sinking, but for

a loss resulting from a lawsuit over the sinking. And this sinking allegedly resulted not from the mere use of PJM's slip, which was the subject of the Slip Rental Agreement, but from alleged negligence in the execution of a separate agreement to commission the vessel.[9]

In this way, the context of the contract makes clear that it should be limited to the slip rental context; PJM's broader construction simply does not make sense. Under PJM's construction, it could sue Picchione for attorney's fees if it incurred expenses defending almost any conceivable suit -- even if the suit arose from an incident not related to Picchione in the slightest. For example, if another patron slipped and fell at the Marina and sued PJM, PJM's construction would allow it to sue Picchione for "loss" to PJM arising out of the "incident occurring . . . on the premises of the marina." Even if the construction was limited to incidents "occurring on or about Tenant's vessel," PJM's construction would require Picchione to defend PJM if a third party was injured while

---

[9]    PJM argues that plaintiffs' complaint alleged negligence attributable to the mere slip rental. PJM argues that Picchione should be treated like its insurer, and that Paragraph 19 imposes on him a duty to defend PJM against any pleadings raising claims that might be covered under Paragraph 19, even if his ultimate claims only related to the commissioning. PJM offers no cases to support its novel theory that such a clause can effectively turn Picchione into an insurer, and we reject their argument. Further, after review of the paragraphs of the complaint and amended complaint upon which PJM relies, we conclude that plaintiffs' pleadings related to PJM's commissioning responsibilities, not its slip rental.

a PJM agent was moving the boat. This is an absurd result, and we will not so construe the contract. See Dubis v. East Greenwich Fire Dist., 754 A.2d 98, 101 (R.I. 2000) ("To construe this unambiguous contract any other way . . . would produce an absurd result."). Instead, we conclude that a Rhode Island court interpreting this contract would construe it as limited to indemnity for loss causally connected to the purpose of the contract. See Hingham Mut. Fire Ins. Co. v. Heroux, 549 A.2d 265, 267 (R.I. 1988) (observing that a similar limitation could be read "as intending to limit the scope of coverage to incidents with a causal connection to the premises, not to incidents that merely occur on the premises") (citing Hanson v. General Accident Fire & Life Ins. Corp., 450 So. 2d 1260, 1261-62 (Fla. Dist. Ct. App. 1984)). Here, we agree with the district court that the sinking was causally connected to the commissioning process and not to the slip rental agreement.

### III.  Conclusion

For all of the foregoing reasons, the judgment below is affirmed in all respects.

**Affirmed**.

-23-