# United States Court of Appeals
## For the First Circuit

No. 10-1409

RICHARD S. FAIREST-KNIGHT; VALERIE A. FAIREST-BROOKE;
CONJUGAL PARTNERSHIP FAIREST-FAIREST;
A.S. F-B, Minor; M.A. F-B, Minor,

Plaintiffs, Appellees,

v.

MARINE WORLD DISTRIBUTORS, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Camille L. Vélez-Rivé, U.S. Magistrate Judge]

Before

Torruella, Siler,* and Howard,
Circuit Judges.

Manuel Fernández-Bared, with whom Toro, Colón, Mullet, Rivera
& Sifre, P.S.C., was on brief for appellant.
Antonio Juan Bennazar-Zequeira, with whom Bennazar, García,
Robles & Milián, CSP, was on brief for appellees.

July 15, 2011

---

* Of the Sixth Circuit, sitting by designation.

**TORRUELLA**, <u>Circuit Judge</u>. This case, involving the saga of an extremely frustrated boat owner, provides further support for the occasionally expressed view that the two happiest days of a boat owner's life are the day he buys his boat and the day he sells it. Appellees will have to remain satisfied with this allotment of joy, as we now reverse the district court and hold that there was insufficient proof of causation to support finding the appellant liable.

## I.  Background and prior proceedings

Appellant Marine World Distributors, Inc. ("Marine World") does business in the sale, service and repair of marine vessels, with its principal offices in San Juan, Puerto Rico. In 2004, Marine World offered for sale a previously owned twenty-six foot 2001 Bayliner Ciera 2655 motorboat (the "boat"). On March 29, 2004, Mr. Carlos Suárez, a certified marine surveyor, inspected and appraised the boat, noting that the engine could not be tested because no cooling water was available. Nevertheless, Suárez concluded that the boat was good for intended cruising around Puerto Rico and coastal waters. On August 13, 2004, Appellee Richard S. Fairest-Knight ("Fairest-Knight") purchased the boat from Marine World for $38,000.[1] Fairest-Knight had no previous boating experience, and this was his first boat purchase. The boat

---

[1]  Fairest-Knight's complaint lists the purchase price as $39,075, whereas the bill of sale lists $38,000. The correct figure is not material to this dispute.

was purchased "as is," as expressly provided in the Sales Order, and Fairest-Knight was aware that no express or implied warranty resulted from Marine World's sale of the boat. Fairest-Knight insured the boat and contracted with a company that provides emergency towing assistance.

While operating the boat on January 22, 2005, approximately five months after he purchased it, Fairest-Knight observed that the boat's oil alarm was triggered and that oil had drained from the engine into the motor compartment. On January 27, 2005, Marine World inspected the engine, and on February 8, 2005, it performed the work necessary to correct the oil leakage, as authorized by Fairest-Knight. This incident would become one in a series of periodic breakdowns and other problems with the boat over the next several years. On each occasion, Fairest-Knight would bring the boat back to Marine World to be repaired, at which point Marine World would inspect the problem, tender a diagnosis and perform the indicated repairs. Marine World frequently performed sea trials to confirm that the problem had been corrected. No other person or entity serviced the boat during this time. Over the years, the repairs performed by Marine World included the following:

> a) cleaning the engine room and replacing the oil sender thread, oil sensor and various other corroded fittings (February 8, 2005);

b) performing a tune up, replacing the impeller, and sanding and painting pulleys (June 6, 2005);

c) replacing the sea water pump and serpentine belt (August 23, 2005);

d) removing the engine, disassembling the manifolds and elbows, starter, engine points, power steering pump, and pulleys, as well as cleaning and painting those parts and the oil pan, followed by a sea trial (October 26, 2005);

e) installing a missing power steering pump bracket (November 19, 2005);

f) reconnecting GPS terminals, performing a tune up, and conducting a sea trial (May 17, 2006);

g) replacing the electric fuel pump, cleaning the carburetor, and conducting a sea trial (May 27, 2006);

h) conducting a sea trial (June 5, 2006);

i) removing and charging the batteries (August 10, 2006);

j) replacing the fuel tank vent (August 12, 2006);

k) conducting a sea trial (August 15, 2006);

l) replacing the fuel pick-up assembly (August 30, 2006);

m) overhauling the engine, replacing the manifolds and elbows, and conducting a sea trial (November 6, 2006);

n) replacing the exhaust flappers (December 13, 2006);

o) replacing the engine longblock (February 15, 2007);

p) replacing the impeller kit and flappers (May 14, 2007).

Despite these repairs, Fairest-Knight experienced repeated malfunctions while using the boat, often involving complete engine failures that required towing the boat back to port.

The culmination of these incidents occurred on April 14, 2007 when Fairest-Knight, together with his wife and two sons, also appellees, embarked on a trip to Costa Bonita, located on the island of Culebra, approximately twenty miles east of Puerto Rico. After several engine failures, large amounts of smoke began to emanate from the engine compartment. Fearing that the boat might ignite, sink and/or explode, the family donned life jackets and prepared to abandon the vessel. Fairest-Knight opened the engine compartment and the smoke began to dissipate. The boat was then towed back to Puerto del Rey in Fajardo, where the boat has since remained, unused. Between May 14 and May 22, 2007, Marine World performed repairs to the boat without charge to Fairest-Knight, who was unaware that this work had been completed until after proceedings in this case had begun.

Between August 2004, when the boat was first delivered to Fairest-Knight, until he last used it in April 2007, Fairest-Knight incurred expenses totaling $16,139.34 for repairs, $3,195.20 for towage and $2,990.00 for wharfage and insurance. During this time, a period of 32 months, the boat was undergoing service or was otherwise unuseable for 276 days, or approximately 9 months.

On August 8, 2007, Fairest-Knight filed a complaint against Marine World in the District Court of Puerto Rico, raising claims under admiralty law and Article 1802 of the Puerto Rico Civil Code. After a four-day bench trial, the district court found that Marine World "breached its duty to a workmanlike performance upon which plaintiffs had a right to rely." The district court found that the "repeated repairs which had to be done to the boat over an extended period of time" was evidence of Marine World's breach, noting that "there was a repeated failure to identify the source of the engine's failure despite representations to plaintiffs that the boat was in a seaworthy condition," and that "Marine World was the only entity which serviced the boat during the period of time at issue." The district court rejected Marine World's theory that Fairest-Knight failed to properly maintain the boat as not credible, given that the evidence at trial showed that Fairest-Knight "followed the recommendations made by Marine World as to replacement of parts and the boat's maintenance," and that, given how much time the boat spent in its shop, the onus was on Marine World to notice and inform Fairest-Knight of any need for maintenance. The district court awarded Fairest-Knight $15,739.96 for the faulty repairs; $3,195.20 for towage expenses; $2,990 for storage and insurance expenses up to June 20, 2007, and $13 per day thereafter until the entry of judgment; $55,000 to Fairest-Knight and his family for the negligent infliction of emotional distress

and pain and suffering; and costs and attorneys' fees. Marine World appealed on March 5, 2010.

## II. Discussion

### A. Standard of review

"'Where, as here, the district court conducts a bench trial and serves as the factfinder, its determinations of negligence, proximate cause, and similar issues are entitled to considerable deference.' Specifically, such review is for clear error." N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 67 (1st Cir. 2009) (quoting Jackson v. United States, 156 F.3d 230, 232 (1st Cir. 1998)). A finding qualifies as "clearly erroneous" when our review of the record leaves us "with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

### B. Was Marine World liable?

Marine World contends that the district court erred in finding it liable to appellees for having breached its duty to carry out the agreed-upon repairs in a workmanlike fashion. Marine World insists that there was insufficient evidence that their repairs were the cause of the repeated problems experienced by appellees' boat. Fairest-Knight argues that a party does not need to act negligently to be in breach of the implied warranty, and that Marine World's inability to finally resolve the various

problems plaguing his boat shows that it was in breach of its implied warranty of workmanlike performance.

"[C]ontracts for repairs to a vessel . . . come under the scope of admiralty jurisdiction." La Esperanza de P.R., Inc. v. Pérez y Cía. de P.R., 124 F.3d 10, 16 (1st Cir. 1997). This brings such a case under federal jurisdiction. See U.S. Const. art. III, § 2. "Admiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law." Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 625 (1st Cir. 1994). "In the absence of a relevant statute, the judicially-developed norms of the general maritime law, 'an amalgam of traditional common-law rules, modifications of those rules, and newly created rules,' governs actions in admiralty." La Esperanza, 124 F.3d at 16 (quoting East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 865 (1986)). Although state law may supplement federal maritime law when the latter is silent or where a local matter is at issue, it "may not be applied where it would conflict with [a federal] maritime law." Floyd v. Lykes Bros. S.S. Co., 844 F.2d 1044, 1047 (3d Cir. 1988).

The First Circuit has acknowledged three potential sources of liability under federal maritime law for a ship repairer's infelicitous work. These are liability via expressly assumed contractual obligations, the maritime tort of negligence, and the "implied warranty of workmanlike performance that attaches

to admiralty contracts under the rule of <u>Ryan Stevedoring Co.</u> v. <u>Pan-Atlantic S.S. Corp.</u>, 350 U.S. 124, 76 S. Ct. 232, 100 L.Ed. 133 (1956)." <u>La Esperanza</u>, 124 F.3d at 16-17. The theory of liability relevant to this appeal is the latter, the implied warranty of workmanlike performance.

Although originating in disputes involving the indemnification of shipowners, we recognized in <u>La Esperanza</u> that liability under the implied warranty of workmanlike performance extends to disputes between shipowners and shipyards. In <u>La Esperanza</u>, a shipowner sued a shipyard for negligently damaging the boat it had been hired to repair. We affirmed the district court's finding that the shipyard was liable for the negligence of its repairs, noting that the shipyard's failure to properly complete the requisite repairs "constituted a breach of an express and implied contractual obligation, particularly in view of the fact that evidence in the record substantiates that similarly situated ship repairers could have" completed the repairs correctly. <u>Id.</u> at 19.[2]

We additionally noted that although the implied warranty of workmanlike performance does not impose a strict liability regime on ship repairers, and instead "parallels" a negligence

---

[2] The contract between the shipowner and the shipyard included a provision stating that the shipyard committed "to use materials and execute work to standard ship repair practice," a clause that we found made express "the otherwise implied warranty of workmanlike performance in marine contracts." <u>La Esperanza</u>, 124 F.3d at 18-19.

standard, nevertheless, a shipowner could recover for a breach of the implied warranty of workmanlike service even when "such performance was done without negligence."  Id. at 17 (quoting SS Amazonia v. N.J. Export Marine Carpenters, Inc., 564 F.2d 5, 8 (2d Cir. 1977)); see also Feliciano v. Compañía Transatlántica Española, S.A., 411 F.2d 976, 978 (1st Cir. 1969) (noting that the implied warranty cause of action acknowledged in Ryan was based neither on negligence or unseaworthiness, but "is strictly contractual in nature, existing independently of tort.").  However, La Esperanza did not reduce or eliminate a plaintiff's burden of proving that the defendant's conduct caused his injury.  See SS Amazonia, 564 F.2d at 8 (stating that recovery under a breach of an implied warranty of workmanlike performance claim requires showing that the sub-standard work performed "caused the damage claimed").

For starters, although recovery for breach of implied warranty does not invariably require proof of negligence, the implied warranty does not go so far as to "impos[e] strict liability."  La Esperanza, 124 F.3d at 17.  But in this regard, it is surely notable that even claims of unseaworthiness, which do "impose a strict liability regime upon shipowners," Napier v. F/V DEESIE, Inc., 454 F.3d 61, 68 (1st Cir. 2006), require the plaintiff to show that the defendant's conduct was the proximate cause of his injury.  In other words, even the "absolute duty [of] shipowners to furnish a 'seaworthy' ship" is limited to those

injuries "caused by any defect in a vessel or its appurtenant appliances or equipment." Id. at 67-68 (emphasis added); see also Poulis-Minott v. Smith, 388 F.3d 354, 366 (1st Cir. 2004); Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 453 (1st Cir. 1996). Because La Esperanza acknowledged liability under a theory of a breach of an implied warranty to be more limited than strict liability, and because strict liability claims (in the form of claims of unseaworthiness) themselves require proof of causation, it stands to reason that La Esperanza did not absolve parties claiming breach of an implied warranty of workmanlike service from proving that the alleged breach caused their injury. Causation must be established by a preponderance of the evidence. See Marquette Trans. Co., Inc. v. La. Mach. Co., Inc., 367 F.3d 398, 402 (5th Cir. 2004).[3]

Moreover, although in La Esperanza we stated that "[h]ere, one witnesses a ship that came in for repairs under her own power . . . but somewhere, somehow, something went wrong," 124 F.3d at 18, a substantial portion of the opinion in La Esperanza

---

[3]  The appellees contended at oral argument that Marquette is inapplicable in light of our opinion in La Esperanza. We acknowledge that Marquette is in tension with La Esperanza insofar as it suggests that plaintiffs pursuing a breach of an implied warranty claim must show negligence, see Marquette, 367 F.3d at 402 ("[T]he evidence available must be sufficient to find both negligence and causation." (emphasis modified)). However, whatever may be the case with proof of negligence in implied warranty cases, proof of causation remains indispensable, and on that score we agree with Marquette's description of the applicable burden of proof.

was in fact devoted to explaining how the shipyard's performance -- its unsuited method of removing the existing hull plates, its equally unsuited method of patching the holes it thereby created, and the careless way in which the boat was subsequently stored -- had caused significant damage to the ship's hull, electrical system, upper deck and carpeting. See La Esperanza, 124 F.3d at 14-15, 17-19. The shipyard also never fully completed the contracted-for repairs and, "seeking to extricate itself from a predicament of its own making . . . told the shipowner, essentially, that it . . . had a problem on its hands, and maybe it should consider hiring a special welding consultant." Id. at 18. Rather than mere speculation, in other words, there was quite substantial evidence that the shipyard's conduct had caused the damage to the plaintiff's vessel.

By the same token, our observation that where a shipyard represents itself as being "a competent shipyard skilled in doing the type of work requested by the shipowner," then the latter has "a right to rely on the [shipyard's] expertise" and may "expect a stable seaworthy vessel upon completion of the repairs, regardless of the condition of the boat[] prior to repairs," La Esperanza, 124 F.3d at 18 (internal quotation marks omitted), should not be read -- as appellees appear to suggest -- to hold that once a shipyard has undertaken to repair a boat, any subsequent breakdowns or problems may, without more, be presumed to have been caused by

-12-

the shipyard.  The facts in <u>La Esperanza</u> clearly indicated that it was the shipyard's inability and/or unwillingness to properly complete the work it had specifically contracted to do that had caused the damage to the ship, which bolstered the finding of liability.

In light of these observations, the fact that neither the appellees nor the district court were able to provide an explanation as to how the chronic problems with the boat were the result of Marine World's acts or omissions takes on dispositive salience.[4]  In supporting its liability determination, the district court stated that

> [e]vidence of the breach of Marine World are the repeated repairs which had to be done to the boat over an extended period of time . . . there was a repeated failure to identify the source of the engine's failure . . . Marine World was the only entity which serviced the boat during the period of time at issue. . . . The best evidence that the repairs to the boat by Marine World were faulty are the invoices which show the boat could not be used for its

---

[4]  Appellees emphasize that the inspection of the boat commissioned by Marine World did not include any test of the engine.  The inspection report clearly stated that the engine had not been tested, Fairest was apparently aware of the certification at the time of purchase, and the purchase agreement explicitly specifies that the boat was being sold "as is" -- meaning, as Fairest conceded at trial, that "there was not an expressed or implied warranty for [the] boat."  We see no reason, on these facts, to construe the incomplete inspection as a breach of the implied warranty of workmanlike performance.  <u>See</u> <u>N. Ins. Co. of N.Y.</u>, 579 F.3d at 67-68.  In any case, the basis for this lawsuit is whether Marine World breached their duty of providing workmanlike performance in repairing the boat, not whether they improperly sold appellee a boat that had not been fully tested.

intended use over extended periods of time because the boat was being repaired for multiple malfunctions.

We cannot agree.  The fact that multiple repairs were required, without more, cannot be taken to establish that it was Marine World's unworkmanlike conduct that brought about the need for the repairs.  In other words, if the hypothesis is that Marine World's unworkmanlike performance caused the need for the repeated repairs, then the fact that the repairs were required cannot itself be adduced as evidence supporting that hypothesis -- it is what needs explaining, and so cannot, on pain of circularity, be what does the explaining.[5]  From what we are able to ascertain in the record, Marine World was generally able to diagnose and repair each problem as it arose.[6]  Fairest-Knight conceded at trial that he had no evidence of sub-standard performance by Marine World.  No evidence was introduced that Marine World employed improper repair procedures or used sub-standard parts, nor is there any evidence that Marine World at any point mis-diagnosed the specific problem reported by Fairest-Knight.  There is no evidence that it was poor work by Marine World rather than poor design, poor manufacture,

---

[5]  Why does opium make men drowsy?  Because it possesses a dormitive power.  (With apologies to Molière, Le Malade Imaginaire (1673), Act III, scene iii.)

[6]  Appellees note that Marine World incorrectly diagnosed the source of an oil leak in January, 2005.  It is undisputed, however, that Marine World made the correct repair after discovering the actual cause of the leak.

-14-

poor maintenance or abuse by the boat's previous owner, or something else -- including the appellee's admitted inexperience with boat ownership -- that caused the boat's various problems. We have no basis on which to even speculate as to whether the same series of problems would have arisen had Fairest-Knight brought the boat to a different shipyard for repairs. See La Esperanza, 124 F.3d at 19.

Although circumstantial evidence may in some cases be used to establish causation, the circumstances must nevertheless allow for a "strong inference[]" of causation. See Marquette, 367 F.3d at 402, 404. Exclusivity of control or possession is an important factor in supporting this inference. Id. at 404; N. Ins. Co. of N.Y., 579 F.3d at 69-70 (where defendant marina did not have exclusive possession of the boat, no presumption of fault would apply.) In this case, we note that possession of the boat alternated between Fairest-Knight and Marine World during the relevant time period, and that Fairest-Knight made use of the boat, even if not always successfully, on multiple occasions. Fairest-Knight claims that between the time the boat was delivered and the final April 14, 2007 incident, the boat spent 276 days "in repairs, undergoing service, or simply not working." Assuming this to be accurate, we can infer that during this time the boat spent nearly 700 days, or approximately 23 months, in Fairest-Knight's possession. This makes it difficult to say that it is more likely

-15-

than not that the problems with Fairest-Knight's boat were caused by Marine World, which did not even have possession of the boat for the majority of the time in question. See id. at 70 (describing owner's presence on the boat several days before its sinking, his hiring of an independent mechanic, and his implied permission to his friends to access the boat without prior approval as "the kind of activity which, through its interference with [defendant marina's] control over the boat, would cast doubt on the fairness of presuming that [defendant marina] was responsible [for the boat's sinking]").

The appellees insist that their inability to identify the cause of the boat's problems should not defeat their claim. They cite Ryan for the proposition that a "contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense." Ryan, 350 U.S. at 134-35. The appellees' reliance on Ryan might be more convincing if it had already been established that Marine World's conduct was the cause of their injury. After all, in Ryan the Supreme Court acknowledged liability premised on breach of an implied warranty of workmanlike service provided that said breach had caused the complained-of injury. See Ryan, 350 U.S. at 132 ("The other question is whether . . . a stevedoring contractor is obligated to reimburse a shipowner for damages caused it by the contractor's improper stowage of cargo." (emphasis added)). It was

-16-

in this context that the Supreme Court rejected the stevedoring contractor's argument that "because the shipowner had an obligation to supervise the stowage and had a right to reject unsafe stowage of the cargo," its failure to object prior to the accident extinguished its right to indemnification from the shipowner. Id. at 134. There was, in this context, no question as to whether the contractor's acts or omissions had caused the injury. But that question lies at the heart of this case, and nothing in Ryan suggests that the appellees may avoid having to answer it.

In short, absent sufficient proof of causation, the troubles experienced by Fairest-Knight with his boat -- while undeniably frustrating -- do not make out a viable breach of warranty claim. We therefore hold that the district court clearly erred in finding otherwise, and reverse its finding that appellants breached the implied warranty of workmanlike service.

## C. Damages

The appellees claimed damages both under admiralty law and Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141. The district court, exercising pendent jurisdiction over the state law claim, cited Article 1802 of the Puerto Rico Civil Code as the basis for its award of damages for negligent infliction of emotional distress and pain and suffering.[7] This statute provides

---

[7] It is possible that federal maritime law would preclude the appellees' state law cause of action for the negligent infliction of emotional distress. State law may supplement maritime law when

-17-

that "[a] person who by an act or omission _causes_ damage to another through fault or negligence shall be obliged to repair the damage so done." 31 L.P.R.A. § 5141 (emphasis added). Causation is thus clearly an element under Article 1802. See Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1, 1994 JTS 121, 1994 P.R.-Eng. 909,527, slip op. at 10 (P.R. 1994); Marital Cmty. k/a Luz M. Hernández and Edgardo López Flores v. González Padín Co., Inc., 117 D.P.R. 94, 17 P.R. Offic. Trans. 111, slip op. at 125 (P.R. 1986). Because appellees failed to establish that Marine World was the cause of the boat's chronic problems, there was no basis for an award of damages under either the admiralty or Article 1802 claims.

### III. Conclusion

We take it as clearly settled that shipowners may only recover from ship repairers under an implied warranty theory if the alleged breach is shown to have caused the plaintiff's injury.

---

maritime law is silent or where a local matter is at issue. See Floyd v. Lykes Bros. S.S. Co., 844 F.2d 1044, 1047 (3d Cir. 1988). However, "state law may not be applied where it would conflict with [a federal] maritime law." Id. at 1047; see also Askew v. Am. Waterways Operators, Inc., 411 U.S. 325, 341 (1973). A maritime tort of negligent infliction of emotional distress has been recognized in the Ninth Circuit; see Chan v. Society Expeditions, Inc., 39 F.3d 1398 (9th Cir. 1994). The First Circuit has not yet definitively addressed this question. See, e.g. Peemoller Sultan v. Pleasure Craft Contender 25, 139 F. Supp. 2d 230, 234 (D.P.R. 2001); Ellenwood v. Exxon Shipping Co., 984 F.2d 1270, 1282-83 (1st Cir. 1993) (declining to decide whether "a seaman may recover emotional distress damages without showing a physical injury."). We decline to decide this question, as it is apparent that appellees' failure to show causation dooms their claim, regardless of whether it is brought under the auspices of federal maritime or state law.

-18-

Appellees failed to prove that appellant's conduct caused their injury. Accordingly, the district court's finding of liability is reversed, and its award of damages and attorneys' fees in favor of appellees is vacated.

**<u>So ordered</u>**.